

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-27-1999

# Bartnicki v. Vopper

Precedential or Non-Precedential:

Docket 98- 7156

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Bartnicki v. Vopper" (1999). *1999 Decisions.* Paper 327.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/327

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 27, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7156

GLORIA BARTNICKI and ANTHONY F. KANE, JR.

v.

FREDERICK W. VOPPER, a/k/a FRED WILLIAMS;
KEYMARKET OF NEPA, INC., d/b/a WILK RADIO;
LACKAZERNE INC., d/b/a WGBI RADIO; JANE DOE;
JOHN DOE; JACK YOCUM

   Frederick W. Vopper, a/k/a Fred Williams;
   Keymarket of Nepa, Inc., d/b/a WILK Radio;
   Lackazerne, Inc., d/b/a WGBI Radio; Jack
   Yocum,

   Appellants

UNITED STATES OF AMERICA,

   Intervenor

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 94-cv-01201)
District Judge: Hon. Edwin M. Kosik

Argued October 5, 1998

Before: SLOVITER and COWEN, Circuit Judges,
and POLLAK,* District Judge

_____

* Hon. Louis H. Pollak, United States District Court for the Eastern
District of Pennsylvania, sitting by designation.

(Filed December 27, 1999)

Donald H. Brobst (Argued)
Rosenn, Jenkins & Greenwald,
 L.L.P.
Wilkes-Barre, Pennsylvania 18711

 Attorneys for Appellants

Raymond P. Wendolowski (Argued)
Cynthia R. Vullo
Scott C. Gartley
Koff, Wendolowski, Ferguson &
 Mangan, P.C.
Wilkes-Barre, Pennsylvania
 18701-2721

 Attorneys for Appellees

Frank J. Aritz (Argued)
Kingston, Pennsylvania 18704

 Attorney for Appellant,
 Jack Yocum

Frank W. Hunger
 Assistant Attorney General
David M. Barasch
 United States Attorney
Douglas N. Letter
Scott R. McIntosh
 Attorneys, Appellate Staff
Civil Division, Department of Justice
Washington, D.C. 20530

 Attorneys for Intervenor,
 United States

        Mark P. Widoff
        Pennsylvania State Education
         Association
        Harrisburg, Pennsylvania 17105

        Jeremiah A. Collins
        John M. West
        Bredhoff & Kaiser, P.L.L.C.
        Washington, D.C. 20036

         Attorneys for Amicus,
         Pennsylvania State Education
         Association

OPINION OF THE COURT

SLOVITER, Circuit Judge.

At issue is whether the First Amendment precludes imposition of civil damages for the disclosure of portions of a tape recording of an intercepted telephone conversation containing information of public significance when the defendants, two radio stations, their reporter, and the individual who furnished the tape recording, played no direct or indirect role in the interception.

I.

BACKGROUND

A.

From the beginning of 1992 until the beginning of 1994, Wyoming Valley West School District was in contract negotiations with the Wyoming Valley West School District Teachers' Union (the "Teachers' Union") over the terms of the teachers' new contract. The negotiations, which were markedly contentious, generated significant public interest and were frequently covered by the news media.

Plaintiffs Gloria Bartnicki and Anthony F. Kane, Jr., as well as defendant Jack Yocum, all were heavily involved in

3

the negotiating process. Bartnicki was the chief negotiator on behalf of the Teachers' Union. Kane, a teacher at Wyoming Valley West High School, served as president of the local union. Yocum served as president of the Wyoming Valley West Taxpayers' Association, an organization formed by local citizens for the sole purpose of opposing the Teachers' Union's proposals.

In May of 1993, Bartnicki, using her cellular phone, had a conversation with Kane. They discussed whether the teachers would obtain a three-percent raise, as suggested by the Wyoming Valley West School Board, or a six-percent raise, as suggested by the Teachers' Union. In the course of their phone conversation, Kane stated:

> If they're not going to move for three percent, we're gonna have to go to their, their homes . . . to blow off their front porches, we'll have to do some work on some of those guys . . . . Really, uh, really and truthfully, because this is, you know, this is bad news (undecipherable) The part that bothers me, they could still have kept to their three percent, but they're again negotiating in the paper. This newspaper report knew it was three percent. What they should have said,`we'll meet and discuss this.' You don't discuss the items in public.

App. at 35-36. Bartnicki responded, "No," and, Kane continued, "You don't discuss this in public . . . . Particularly with the press." App. at 36.

This conversation, including the statements quoted above, was intercepted and recorded by an unknown person, and the tape left in Yocum's mailbox. Yocum retrieved the tape, listened to it, and recognized the voices of Bartnicki and Kane. He then gave a copy of the tape to Fred Williams, also known as Frederick W. Vopper, of WILK Radio and Rob Neyhard of WARM Radio, both local radio stations. Williams repeatedly played part of the tape on the air as part of the Fred Williams Show, a radio news/public affairs talk show which is broadcast simultaneously over WILK Radio and WGBI-AM. The tape was also aired on some local television stations and written transcripts were published in some newspapers.

B.

Bartnicki and Kane sued Yocum, Williams, WILK Radio, and WGBI Radio (hereafter "media defendants") under both federal and state law. They based their federal claims on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 28 U.S.C. S 2510 et seq., and their state claims on the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. S 5701 et seq. As relief, Bartnicki and Kane sought (1) actual damages in excess of $50,000, (2) statutory damages under 18 U.S.C. S 2520(c)(2), (3) liquidated damages under 18 Pa. Cons. Stat. S 5725(a)(1), (4) punitive damages, and (5) attorneys' fees and costs.

Bartnicki, Kane, and the defendants each moved for summary judgment. The District Court denied these motions on June 14, 1996 and denied defendants' motion to reconsider on November 8, 1996, specifically holding that imposing liability on the defendants would not violate the First Amendment.

The District Court subsequently certified two questions as controlling questions of law: "(1) whether the imposition of liability on the media Defendants under the [wiretapping statutes] solely for broadcasting the newsworthy tape on the Defendant Fred Williams' radio news/public affairs program, when the tape was illegally intercepted and recorded by unknown persons who were not agents of the Defendants, violates the First Amendment; and (2) whether imposition of liability under the aforesaid [wiretapping statutes] on Defendant Jack Yocum solely for providing the anonymously intercepted and recorded tape to the media Defendants violates the First Amendment." App. at 388. Williams, WILK Radio, and WGBI Radio subsequently petitioned for permission to appeal. Yocum filed an answer to the petition in which he joined the media defendants' request that we hear this appeal. We granted the petition by order dated February 26, 1998. The Pennsylvania State Education Association submitted a brief as amicus curiae in support of the appellees, and the United States has intervened as of right pursuant to 28 U.S.C. S 2403.

5

C.

The District Court had jurisdiction to consider claims based on the Omnibus Crime Control and Safe Streets Act of 1968 pursuant to 28 U.S.C. S 1331. It had supplemental jurisdiction pursuant to 28 U.S.C. S 1367 to consider claims based on the Pennsylvania Wiretapping and Electronic Surveillance Control Act. We have appellate jurisdiction to review the District Court's substantive determination pursuant to 28 U.S.C. S 1292(b).

The scope of our review in a permitted interlocutory appeal is limited to questions of law raised by the underlying order. We are not limited to answering the questions certified, however, and may address any issue necessary to decide the appeal. See Dailey v. National Hockey League, 987 F.2d 172, 175 (3d Cir. 1993).

We review the grant or denial of a motion for summary judgment de novo. See H.K. Porter Co. v. Pennsylvania Ins. Guaranty Ass'n, 75 F.3d 137, 140 (3d Cir. 1996). We are "required to apply the same test the district court should have utilized initially," to view inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion, and to take the non-movant's allegations as true whenever these allegations conflict with those of the movant. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).

D.

The Federal Omnibus Crime Control and Safe Streets Act of 1968 (the "Federal Wiretapping Act") provides in relevant part:

> (1) Except as otherwise specifically provided in this chapter any person who --
>
>  . . .
>
> (c) intentionally discloses, or endeavors to discl ose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

6

(d) intentionally uses, or endeavors to use, the
contents of any wire, oral, or electronic
communication, knowing or having reason to know
that the information was obtained through the
interception of a wire, oral, or electronic
communication in violation of this subsection . . .

shall be punished as provided in subsection (4) or shall
be subject to suit as provided in subsection (5).

18 U.S.C. S 2511. It continues:

(a) In general. -- Except as provided in section
2511(2)(a)(ii), any person whose wire, oral, or electronic
communication is intercepted, disclosed, or
intentionally used in violation of this chapter may in a
civil action recover from the person or entity which
engaged in the violation such relief as may be
appropriate.

18 U.S.C. S 2520. The Federal Wiretapping Act thus creates
civil and criminal causes of action against those who
intentionally use or disclose to another the contents of a
wire, oral, or electronic communication, knowing or having
reason to know that the information was obtained in
violation of the statute.

The Pennsylvania Wiretapping and Electronic
Surveillance Control Act (the "Pennsylvania Wiretapping
Act") is similar. It provides:

Except as otherwise provided in this chapter, a person
is guilty of a felony of the third degree if he:

 . . .

 (2) intentionally discloses or endeavors to di sclose to
any other person the contents of any wire, electronic or
oral communication, or evidence derived therefrom,
knowing or having reason to know that the information
was obtained through the interception of a wire,
electronic or oral communication; or

 (3) intentionally uses or endeavors to use the
contents of any wire, electronic or oral communication,
or evidence derived therefrom, knowing or having
reason to know that the information was obtained

7

through the interception of a wire, electronic or oral communication.

18 Pa. Cons. Stat. S 5703. It further provides:

(a) Cause of action. -- Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication . . . .

18 Pa. Cons. Stat. S 5725. The Pennsylvania Wiretapping Act thus also creates civil and criminal causes of action based on the knowing or negligent use or disclosure of illegally intercepted material. We refer to the federal and state statutes at issue here as "The Wiretapping Acts."

Both Acts also explicitly authorize the recovery of civil relief. The Federal Wiretapping Act provides that a court may "assess as damages whichever is the greater of --

(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(B) statutory damages of whichever is the grea ter of $100 a day for each day of violation or $10,000."

18 U.S.C. S 2520(c)(2). The Pennsylvania Wiretapping Act specifies that a successful plaintiff "shall be entitled to recover from any such person:

(1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

(2) Punitive damages.

(3) A reasonable attorney's fee and other litigati on costs reasonably incurred."

18 Pa. Cons. Stat. S 5725(a).

8

II.

DISCUSSION

A.

As the District Court acknowledged and the parties do not dispute, the media defendants neither intercepted nor taped the conversation between Bartnicki and Kane. Indeed, the record does not disclose how or by whom the conversation was intercepted. The media defendants argued before the District Court that these facts preclude a court from finding them liable under the Wiretapping Acts. The District Court disagreed. It concluded that, "a violation of these acts can occur by the mere finding that a defendant had a reason to believe that the communication that he disclosed or used was obtained through the use of an illegal interception." Bartnicki v. Vopper, No. 94-1201, slip op. at 5 (M.D. Pa. June 17, 1996). It further opined that such an interpretation of the statute "adheres to the purpose of the act which was to protect wire and oral communications and an individual's privacy interest in such." Id. The District Court concluded that genuine disputes of material fact remain regarding (1) whether the Bartnicki-Kane conversation was illegally intercepted, and if so (2) whether any or all of the defendants knew or had reason to know that that conversation was illegally intercepted. See id. at 5, 10. The parties do not challenge these holdings on appeal.

Hence, this case does not involve the prohibitions of the Wiretapping Acts against the actual interception of wire communications. Nor does it involve any application of the Acts' criminal provisions. Rather, this case focuses exclusively on the portions of the Wiretapping Acts that create causes of action for civil damages against those who use or disclose intercepted communications and who had reason to know that the information was received through an illegal interception.

The defendants argue that applying the damages provision of the Wiretapping Acts to hold them liable for disclosing the Bartnicki-Kane conversation violates the First Amendment. They contend that this case is controlled

9

by the Supreme Court's decisions in a series of cases addressing the tension between the First Amendment and the right to privacy.

In the first of these cases, Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975), the Court considered a private right of action created by a Georgia statute making it a "misdemeanor to publish or broadcast the name or identity of a rape victim." Id. at 472. The Court was asked to decide whether Georgia could impose civil liability on a television broadcasting company, among others, for accurately broadcasting the name of a deceased, 17-year-old rape victim where the reporter obtained the information from official court records open to public inspection.

In the next case, Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978), the Court reviewed a Virginia statute that both provided for the confidentiality of judicial disciplinary proceedings and made it unlawful to divulge the identity of a judge subject to such proceedings prior to the filing of a formal complaint with the state's highest court. The Supreme Court was asked to decide whether Virginia could criminally prosecute a newspaper for publishing accurate information about such proceedings where the newspaper received the information from a participant in the proceedings who had the right to receive the information but not the right to divulge it. See id. at 830.

Finally, in Smith v. Daily Mail Publishing Co., 443 U.S. 97 (1979), the Court considered a West Virginia statute "making it a crime for a newspaper to publish, without the written approval of the juvenile court, the name of any youth charged as a juvenile offender." Id. at 98. The Court was asked to decide whether West Virginia could prosecute two newspapers for publishing the name of a 14-year-old student who was accused of shooting and killing a 15-year-old classmate at the local junior high school. The newspapers had obtained the student's name by interviewing witnesses at the school.

The Supreme Court concluded that each of these attempts to punish or deter the press's publication of truthful information was unconstitutional. The Smith Court,

10

in summarizing the Court's past cases, read them as suggesting at least two propositions: (1) "state action to punish the publication of truthful information seldom can satisfy constitutional standards," and (2) "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 491 U.S. at 102, 103; accord Florida Star v. B.J.F., 491 U.S. 524, 533–37 (1989) (adopting and explaining the justification for the second Smith proposition).

The defendants contend that the information disclosed about the Bartnicki–Kane conversation was lawfully obtained within the meaning of the Smith decision because the defendants in this case neither participated in the presumed interception nor violated any law by receiving the information. They conclude that the Wiretapping Acts may not be applied to hold them liable without first meeting the test of strict scrutiny.

Bartnicki and Kane respond by arguing that the information at issue here was unlawfully obtained because the original interception presumably was illegal. They conclude that applying the Acts to hold the defendants liable is constitutional without subjecting those statutes to any level of First Amendment scrutiny. The parties thus assume that we should determine the constitutionality of the Wiretapping Acts by first determining whether the information disclosed was "lawfully" or "unlawfully" obtained.

Although we are cognizant of the importance of the Cox, Landmark, and Smith cases as background, we decline to read Smith as controlling here. The Supreme Court has explicitly repudiated any suggestion that Smith answers the question whether a statute that limits the dissemination of information obtained by means of questionable legality is subject to First Amendment scrutiny. In Florida Star, the Court stated, "The [Smith] principle does not settle the issue whether, in cases where information has been acquired unlawfully by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well." 491 U.S. at 535 n.8. Similarly,

11

the Smith Court was careful to note that its holding did not reach the issue of unlawful press access. See 443 U.S. at 105.

Moreover, the Supreme Court's practice of narrowly circumscribing its holdings in this area strongly suggests that a rule for undecided cases should not be derived by negative implication from its reported decisions. The defendant in Landmark urged the Court to adopt a blanket rule, protecting the press from any liability for truthfully reporting information concerning public officials and their public duties, but the Supreme Court refused to do so. See 435 U.S. at 838. Instead it considered the very narrow question: "whether [a state] may subject persons, including newspapers, to criminal sanctions for divulging information regarding proceedings before a state judicial commission which is authorized to hear complaints as to judges' disability or misconduct, when such proceedings are declared confidential by the State Constitution and statutes." Id. at 830.

Similarly, the Florida Star Court refused"appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment." 491 U.S. at 532. It stated: "Our cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily. . . . We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." Id. at 532–33.

In keeping with the Supreme Court's approach to deciding these illustrative cases, we will resolve the present controversy not by mechanically applying a test gleaned from Cox and its progeny, but by reviewing First Amendment principles in light of the unique facts and circumstances of this case.

B.

The District Court based its conclusion that the damages provision of the Wiretapping Acts may constitutionally be

applied to penalize the defendants' conduct primarily on the Supreme Court's decision in Cohen v. Cowles Media Co., 501 U.S. 663 (1991). The District Court interpreted that decision as standing for the proposition that a generally applicable law that neither singles out the press for special burdens nor purposefully restricts free expression does not offend the First Amendment. See Bartnicki, slip op. at 8 ("Generally applicable laws `do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.' " (quoting Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991))). The District Court emphasized language from the Cohen opinion in which the Supreme Court stated, " `[i]t is . . . beyond dispute that the publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' " Bartnicki, slip op. at 8 (quoting Cohen, 501 U.S. at 670).

After reviewing the Federal and Pennsylvania Wiretapping Acts, the District Court found that neither Act targets or singles out the press. The District Court also opined that these laws are not "specifically designed to chill free speech." Id. at 7. Based on this finding, it concluded that "both acts are matters of general applicability" and, without further analysis, denied defendants' motion for summary judgment on the basis of the First Amendment.

There is reason to question whether the damages provisions of the Acts are properly categorized as generally applicable laws. Arguably, that term should be reserved for laws that directly regulate conduct rather than speech. See infra at 15. Moreover, it may well be that be that by banning the disclosure of certain information, the damages provisions impose a disproportionate burden on the press. Indeed, we would not be surprised to find that a prohibition on disclosure falls more heavily on the press, which is in the business of disseminating information, than it does on ordinary citizens whose opportunities for spreading information are more limited.

We need not resolve that question, however, because we conclude that, by suggesting that generally applicable laws do not require First Amendment scrutiny when applied to

13

the press, the District Court read the cited portions of Cohen too broadly. In Cohen, the plaintiff, who was actively associated with the election staff of a gubernatorial candidate, offered to provide two newspapers with some information concerning the candidate's opponent in exchange for a promise that the newspapers would not use his name in any resulting story. After having made the promise and secured the information, each newspaper proceeded to publish a story identifying Cohen as the source of the information and highlighting his role in the gubernatorial campaign. Cohen lost his job the day the stories ran. He then sued the publishers of the newspapers in state court and recovered damages under a theory of promissory estoppel. The publishers appealed, arguing that holding them liable for their breached promises would violate the First Amendment.

It is in the context of rejecting this argument that the Supreme Court stated, "[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." Cohen , 501 U.S. at 669. The Court explained that "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." Id. at 670.

The Cohen opinion thus instructs that a law of general applicability, which neither targets nor imposes disproportionate burdens upon the press, is enforceable against the press to the same extent that it is enforceable against individuals or organizations. The question remains whether the damages provisions of the Wiretapping Acts may constitutionally be applied to penalize individuals or organizations for disclosing material they know or have reason to know was illegally intercepted who had no part in the interception.

C.

In order to determine whether the provisions for civil sanctions from the Wiretapping Acts may constitutionally be applied to penalize defendants' disclosure, we must first

14

decide what degree of First Amendment scrutiny should be applied.

The United States argues that the Federal Wiretapping Act is subject to intermediate rather than strict scrutiny. It bases this contention on two subsidiary assertions: (1) that these are "general law[s] that impose[ ] only incidental burdens on expression" and (2) that "to the extent that Title III restricts speech in particular cases, it does so in an entirely content-neutral fashion." United States' Br. at 22. It states that "[a] statute satisfies intermediate scrutiny, if it furthers an important or substantial governmental interest, if the governmental interest is unrelated to the suppression of free expression, and if the incidental restriction on speech is not unnecessarily great." United States' Br. at 11-12. We assume that the United States' arguments apply equally to the Pennsylvania Wiretapping Act, which is substantially similar to the Federal Wiretapping Act.

We first consider the United States' argument that the disclosure provisions of the Wiretapping Acts merit only intermediate scrutiny because they impose only incidental burdens on expression. In support, the United States cites a series of Supreme Court decisions, beginning with United States v. O'Brien, 391 U.S. 367 (1968).

O'Brien was arrested and convicted for burning his draft card on the steps of the South Boston Courthouse. On appeal, O'Brien argued that the federal law, making it an offense to "forge[ ], alter[ ], knowingly destroy[ ], knowingly mutilate[ ], or in any manner change[ ] . . . such [a] certificate," was unconstitutional. Id. at 370 (italics omitted). The Court of Appeals for the First Circuit agreed that this provision unconstitutionally abridged the freedom of speech.

The Supreme Court, however, reversed. It opined that the statute "on its face deals with conduct having no connection with speech. It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct." Id. at 375.1  The Supreme Court nonetheless

_____

1. Respected commentators have taken issue with this holding in O'Brien. See, e.g., Lawrence H. Tribe, American Constitutional Law, S 312-6 at 824-25 (2d ed. 1988).

recognized that O'Brien had burned his draft card as a form of protest against war. Assuming for the sake of argument that "the alleged communicative element in O'Brien's conduct [was] sufficient to bring into play the First Amendment," the Supreme Court held that the statute was still a permissible regulation. Id. at 376. It reasoned that "when `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." Id. The Court stated that such "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest." Id. at 377.

In O'Brien and its progeny, the Supreme Court distinguished between "expressive conduct protected to some extent by the First Amendment" and oral or written expression, which is fully protected by that amendment. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984). "[C]onduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative" is "[s]ymbolic expression," otherwise known as expressive conduct. Id. at 294. The cases the United States cites in addition to O'Brien also focus on the permissibility of regulating expressive conduct. See Barnes v. Glen Theater, Inc., 501 U.S. 560 (1991) (Indiana statute prohibiting complete nudity in public places); Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986) (New York statute authorizing closure of building found to be a public health nuisance); United States v. Albertini, 472 U.S. 675 (1985) (federal statute making it unlawful to reenter a military base after having been barred by the commanding officer); Clark, 468 U.S. at 289 (National Park Service regulation prohibiting camping in Lafayette Park); cf. R.A.V. v. City of St. Paul, 505 U.S. 377 (1992) (Minnesota statute prohibiting display of certain objects, including a burning cross or Nazi swastika).

16

By citing this line of cases in support of its position that intermediate scrutiny applies here, the United States apparently suggests that defendants' actions in disclosing the contents of the Bartnicki-Kane conversation are properly considered "expressive conduct" rather than speech. If this is the thrust of the government's citations, it is not persuasive. The acts on which Bartnicki and Kane base their complaint are Yocum's "intentionally disclos[ing a] tape to several individuals and media sources"[2] and the media defendants' "intentionally disclos[ing] and publish[ing] to the public the entire contents of the private telephone conversation between Bartnicki and Kane." App. at 149. If the acts of "disclosing" and "publishing" information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.

We have no doubt that it is possible to identify some act by the media defendants in the course of preparing the broadcasts during which the tape was disclosed that falls within our ordinary understanding of the term conduct. However, this fact does not alter the analysis. The Supreme Court has observed, "It is possible to find some kernel of expression in almost every activity a person undertakes –– for example, walking down the street or meeting one's friends at a shopping mall –– but such kernel is not sufficient to bring the activity within the protection of the First Amendment." Barnes, 501 U.S. at 570 (quoting Dallas v. Stanglin, 490 U.S. 19, 25 (1989)). Similarly, although it may be possible to find some kernel of conduct in almost every act of expression, such kernel of conduct does not take the defendants' speech activities outside the protection of the First Amendment.

The United States nonetheless insists that intermediate scrutiny is appropriate because the statute, read as a whole, primarily prohibits conduct rather than speech. It notes that the prohibition in 18 U.S.C. S 2511(d) against

_____

2. The complaint also alleges that Yocum "obtained a tape of the surreptitiously recorded telephone conversation," App. at 149, but the complaint does not allege that the mere obtaining of the tape violates either statute.

using or endeavoring to use intercepted material encompasses more than disclosure. The government asserts that it precludes, for example, a person or company from using intercepted material to develop a competing product, to craft a negotiating strategy, or to justify taking disciplinary action against an employee. United States' Br. at 22-23.

The government cites no support for the surprising proposition that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone. We are convinced that this proposition does not accurately state First Amendment law. A statute that prohibited the "use" of evolution theory would surely violate the First Amendment if applied to prohibit the disclosure of Charles Darwin's writings, much as a law that directly prohibited the publication of those writings would surely violate that Amendment.

Because the defendants' acts in this case -- the disclosure and broadcast of information -- contain no significant "nonspeech" elements, we need not decide whether this statute could properly be subjected to lesser scrutiny if applied to prohibit "uses" that do involve such "nonspeech" elements. We merely hold that, when a statute that regulates both speech and conduct is applied to an act of pure speech, that statute must meet the same degree of First Amendment scrutiny as a statute that regulates speech alone.

The United States' second argument -- that intermediate scrutiny applies because the Acts are content-neutral -- is more persuasive.

When the state uses a "content-based" regulation to restrict free expression, particularly political speech, that regulation is subject to "the most exacting scrutiny." Boos v. Barry, 485 U.S. 312, 321 (1988); Phillips v. Borough of Keyport, 107 F.3d 164, 172 (3d Cir. 1997) (en banc). It will not be upheld unless the state can show that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Boos, 485 U.S. at 321; see also Phillips, 107 F.3d at 172 ("State regulations of speech that are not regarded as content neutral will be

18

sustained only if they are shown to serve a compelling state interest in a manner which involves the least possible burden on expression.").

By contrast, when the state places a reasonable "content-neutral" restriction on speech, such as a time, place and manner regulation, that regulation need not meet the same high degree of scrutiny. "Content-neutral" restrictions are valid under the First Amendment provided that they "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information."[3] Clark, 468 U.S. at 293.

We recognize that an argument could be made that the Wiretapping Acts are content-based. Ordinarily, the distinction between permissible and impermissible regulation of speech depends on whether the law at issue regulates the substantive content of the speech (what is said) or whether it merely regulates the time, place, or manner of the speech (when, where, at what volume, and through which medium it is said). The former regulations are content-based while the latter are content-neutral. The essence of the distinction lies in the fact that, if the regulation were content-based, it would not be possible to determine whether a particular speech is prohibited without referring to the substantive import of that expression.

The United States contends that the Wiretapping Acts are not content-based even in the literal sense referred to above because the Acts define the content that is prohibited by reference to the manner in which the information was acquired, rather than to its subject matter or viewpoint. We suspect that the mere fact that a regulation defines the category of content that is prohibited by reference to its source rather than its subject matter is unlikely to be sufficient to justify treating the regulation as content-neutral. For example, one might argue that a ban on the

_____

3. This standard is little different from that announced in O'Brien as governing conduct regulations that incidentally restrict expressive behavior. See Clark, 468 U.S. at 298.

19

publication of information obtained through experimentation on human embryos would raise sufficient First Amendment concerns to merit heightened scrutiny, even if such experimentation were illegal.

The Supreme Court's decision in Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1985), however, suggests that we are not limited to a literal interpretation of the phrase "content-neutral" but may determine whether speech is content-neutral or content-based with reference to the government's proffered justification for the restriction. In Renton, the Supreme Court described "content-neutral" speech restrictions as those that "are justified without reference to the content of the regulated speech." Id. at 48 (quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976)). We therefore turn to consider the purpose or purposes the Wiretapping Acts are meant to serve.

The Senate Report describes the purposes of the Federal Wiretapping Act as: "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S. Rep. No. 90-1079 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153. Congress thus focused on privacy in adopting 18 U.S.C. S 2511, the provision that prohibits the interception of wire, oral, or electronic communications, as well as the use or disclosure of the contents of illegally intercepted communications. Congress did not, however, define the privacy interest that it intended the Act to protect.

As commonly understood, the right to privacy encompasses both the right "to be free from unreasonable intrusions upon [one's] seclusion" and the right to be free from "unreasonable publicity concerning [one's] private life." Fultz v. Gilliam, 942 F.2d 396, 401 (6th Cir. 1991); see also Whalen v. Roe, 429 U.S. 589 (1977); Paul P. v. Verniero, 170 F.3d 396 (3d Cir. 1999). The Sixth Circuit has opined that "[t]he prohibitions Congress incorporated into section 2511(1) of Title III protect both these interestsfirst, by prohibiting the surreptitious interception of private communications in the first instance -- a highly offensive

20

physical intrusion on the victim's private affairs-- and second, by circumscribing the dissemination of private information so obtained." Fultz, 942 F.2d at 401 (footnote omitted). The First Circuit has similarly suggested that by enacting Title III Congress recognized "that the invasion of privacy is not over when the interception occurs but is compounded by disclosure." Providence Journal Co. v. FBI, 602 F.2d 1010, 1013 (1st Cir. 1979); see also Fultz, 942 F.2d at 402 ("Each time the illicitly obtained recording is replayed to a new and different listener, the scope of the invasion widens and the aggrieved party's injury is aggravated.").

We have no doubt that the state has a significant interest in protecting the latter privacy right -- the right not to have intimate facts concerning one's life disclosed without one's consent. That right is a venerable one whose constitutional significance we have recognized in the past. See Paul P., 170 F.3d at 401-02 (collecting cases). We also have no doubt that the prohibition on using or disclosing the contents of an illegally intercepted communication serves that interest by deterring the publicization of private facts.

We are less certain, however, that the desire to protect the privacy interest that inheres in private facts is a content-neutral justification for restricting speech. The Supreme Court has instructed that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992); accord Lind v. Grimmer, 30 F.3d 115, 117 (9th Cir. 1994) ("Because the[ ] concerns [addressed by the statute] all stem from the direct communicative impact of speech, we conclude that section 11-216(d) regulates speech on the basis of its content.") As Justice O'Connor explained in Boos, "[r]egulations that focus on the direct impact of speech on its audience" -- the speech's "primary effects" -- are not properly treated as content-neutral under Renton. 485 U.S. at 321 (Opinion of O'Connor, J.).

Although the defendants do not argue that the regulations at issue are content-based, there is a not implausible argument that the injury associated with the disclosure of private facts stems from the communicative impact of speech that contains those facts, i.e. having

21

others learn information about which one wishes they had remained ignorant. Thus, under the Supreme Court's jurisprudence, the injury associated with such disclosure constitutes a "primary effect" of the disfavored speech, rather than a "secondary effect." This reasoning might suggest that a statute that regulated expression for the purpose of protecting the right not to have private facts disclosed without permission would be subject to strict scrutiny as a content-based regulation.

We do not decide whether the Wiretapping Acts would indeed be properly categorized as content-based if justified on the basis of a need to prevent the disclosure of private facts because the United States for the most part eschews reliance on that justification in explaining the purpose of those acts. Instead, the United States argues that "the fundamental purpose of Title III is to maintain the confidentiality of wire, electronic, and oral communications." United States' Br. at 33. It reasons that "prohibiting the use of illegally intercepted communication . . . `strengthen[s] subsection (1)(a),' the provision that imposes the underlying ban on unauthorized interception, `by denying the wrongdoer the fruits of his labor' and by eliminating the demand for those fruits by third parties." United States' Br. at 33. We are satisfied that this latter justification does not rely on the communicative impact of speech and, therefore, that the Acts are properly treated as content-neutral.

D.

Accordingly, we adopt the government's position that we should apply intermediate scrutiny in our analysis of the issue before us. In doing so, we must first fix upon an acceptable definition of the term "intermediate scrutiny."[4]

_____

4. In a recent article, the author uses the term" `intermediate scrutiny' to refer to a test that requires a state interest which is greater than legitimate but less than compelling and a fit between means and end that is not necessarily narrowly tailored but has more than just an incidental connection." Jay D. Wexler, Defending the Middle Way: Intermediate Scrutiny as Judicial Minimalism, 66 Geo. Wash. L. Rev. 298, 300 n.15 (1998).

Intermediate scrutiny is used by the Court in a wide variety of cases calling for some balancing. Thus, intermediate scrutiny has been applied to statutes that discriminate on the basis of gender. See Craig v. Boren, 429 U.S. 190, 200 (1976) (holding that prohibiting sale of 3.2% beer to males under 21 and females under 18 did not "closely serve" goal of promoting traffic safety). It is the review standard used to examine whether an even-handed regulation promulgated for a legitimate public interest violates the dormant Commerce Clause. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970) (describing balancing test for state regulation); Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761 (1945) (invalidating limit on train length as not "plainly essential" to further state interest in safety). And in the First Amendment context, intermediate scrutiny has been applied to commercial speech cases, see Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n., 447 U.S. 557, 566 (1980) (establishing four-part test for commercial speech regulation), and to examine the validity of time, place, and manner regulations, see United States v. Grace, 461 U.S. 171 (1983) (invalidating statute prohibiting displaying flag, banner or device in Supreme Court building or on its grounds).

Admittedly, the intermediate scrutiny test applied varies to some extent from context to context, and case to case. But it always encompasses some balancing of the state interest and the means used to effectuate that interest. And despite the frequent tendency to assume that regulations that are reviewed under less exacting scrutiny than strict scrutiny will be upheld, each of the cases referred to above as applying intermediate scrutiny held that the regulation in question was unconstitutional. The reasons varied. Sometimes, the Court held the asserted government interest insufficient to justify an expansive prohibition and noted the government failed to demonstrate that a lesser prohibition would not adequately serve its purpose. See, e.g., Schneider v. State, 308 U.S. 147, 162 (1939) (holding that state interest in preventing littering did not justify ban on leafletting); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 636 (1980) (invalidating prohibition on charitable solicitations for certain charities as too destructive of First Amendment interests). Other

times, the Court held the government failed to show that the challenged regulation substantially served the asserted government interest. See, e.g., Grace, 461 U.S. at 182. It should also be noted that in making the examination into whether the means chosen were those appropriate to the government interest, the Court has not always made a distinction between its analysis for purposes of intermediate scrutiny and for strict scrutiny. See, e.g., Anderson v. Celebrezze, 460 U.S. 780 (1983) (invalidating candidate registration statute because voters' associational and voting rights outweighed state interest).

The test usually applied in First Amendment cases to content-neutral regulation requires an examination of whether the regulation is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984). There is a considerable number of First Amendment cases in which the Supreme Court, applying intermediate scrutiny, has found that the regulation at issue, albeit designed to advance legitimate state interests, failed to withstand that scrutiny. A review of illustrative cases provides some indication of the Court's analytic approach in such instances.

In Schneider, the Court recognized that there is a legitimate government interest in preventing street littering but nevertheless found that "the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it." 308 U.S. at 162. The Court termed the burden imposed on the cities in cleaning and caring for the streets "an indirect consequence of such distribution," and one that resulted from the "constitutional protection of the freedom of speech and press." Id. The Court continued, in language significant for this case, "[t]here are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." Id. (emphasis added).

Similarly, in Village of Schaumburg, the Court recognized that the government had a substantial interest in

24

protecting the public from fraud, crime and undue annoyance, but held that the proffered interest, which the government sought to accomplish by an ordinance that prohibited the solicitation of contributions by charitable organizations that did not use at least 75% of their receipts for "charitable purposes," was "only peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests." 444 U.S. at 636.

Both Schneider and Schaumburg were cited by the Court in a later case to illustrate "the delicate and difficult task [that] falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of[First Amendment] rights." Schad v. Borough of Mount Ephraim, 452 U.S. 61, 70 (1981) (quoting Schneider, 308 U.S. at 161). In Schad, the Court invalidated a zoning ordinance that excluded live entertainment, including nude dancing, throughout the borough after finding that the borough "ha[d] not adequately justified its substantial restriction of protected activity." Id. at 72. Justice Blackmun's concurring opinion makes clear that the burden to "articulate, and support, a reasoned and significant basis" for the governmental regulation should not be viewed as de minimis, even when the regulation is subjected to intermediate scrutiny. Id. at 77; see also Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. Chi. L. Rev. 46, 52-53 (1987) (describing intermediate scrutiny as a test that "takes seriously the inquiries into the substantiality of the governmental interest and the availability of less restrictive alternatives.").

With the Supreme Court precedent as a guide, we examine whether the government has shown that its proffered interest is sufficiently furthered by application to these defendants of the damages provisions of the Wiretapping Acts to justify the impingement on the protected First Amendment interests at stake.

As noted above, the United States contends that the Wiretapping Acts serve the government's interest in protecting privacy by helping "maintain the confidentiality of wire, electronic, and oral communications." United

25

States' Br. at 33. Undoubtedly, this is a significant state interest. We do not understand the defendants to deny that there is an important governmental interest served by the Wiretapping Acts. However, the government recognizes that not all of the provisions of the Wiretapping Acts are being challenged. In fact, only a portion of those Acts are at issue here -- the provisions imposing damages and counsel fees for the use and disclosure of intercepted material on those who played no part in the interception.

The United States asserts that these provisions protect the confidentiality of communications in two ways: (1) "by denying the wrongdoer the fruits of his labor" and (2) "by eliminating the demand for those fruits by third parties." United States' Br. at 33. In this case, however, there is no question of "denying the wrongdoer the fruits of his labor." The record is devoid of any allegation that the defendants encouraged or participated in the interception in a way that would justify characterizing them as "wrongdoers." Thus, the application of these provisions to penalize an individual or radio stations who did participate in the interception and thereafter disclosed the intercepted material is not before us.

We therefore focus on the United States' second contention -- that the provisions promote privacy by eliminating the demand for intercepted materials on the part of third parties. The connection between prohibiting third parties from using or disclosing intercepted material and preventing the initial interception is indirect at best. The United States has offered nothing other than its ipse dixit in support of its suggestion that imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnicki-Kane conversation. Nor has the United States offered any basis for us to conclude that these provisions have deterred any other would-be interceptors.5 Given the indirectness of the

_____

5. As the Supreme Court recently emphasized in invalidating a prohibition on the receipt of honoraria by government employees, "[w]hen the government defends a regulation on speech . . . it must do more than simply `posit the existence of the disease sought to be cured.' . . .

26

manner in which the United States claims the provisions serve its interest, we are not prepared to accept the United States' unsupported allegation that the statute is likely to produce the hypothesized effect. See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841 (1978) ("The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined."). Faced with nothing "more than assertion and conjecture," it would be a long stretch indeed to conclude that the imposition of damages on defendants who were unconnected with the interception even "peripherally promoted" the effort to deter interception. See Village of Schaumburg, 444 U.S. at 636.

When the state seeks to effectuate legitimate state interests,

> it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. Hynes v. Mayor of Oradell, 425 U.S. at 620; First National Bank of Boston v. Bellotti, 435 U.S. 765, 786 (1978)."Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . ." NAACP v. Button, 371 U.S. 415, 438 (1963) (citations omitted).

Village of Schaumburg, 444 U.S. at 637.

In Village of Schaumburg, the Court stated that the Village's legitimate interest in preventing fraud could be better served by requiring solicitors to inform the public of the uses made of their contributions, than by prohibiting solicitation. Id. Similarly, in Martin v. Struthers, 319 U.S. 141, 147-48 (1943), the Court held that in lieu of a complete prohibition of door-to-door solicitation, with its

_____

It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a
direct and material way." United States v. National Treasury Employees Union, 513 U.S. 454, 475 (1995) (citation and internal quotation omitted) (emphasis added).

27

draconian impact on First Amendment values, the City could have used the less restrictive means of punishing those who trespass "in defiance of the previously expressed will of the occupant." Indeed, the Wiretapping Acts already provide for punishment of the offender, i.e., the individual who intercepted the wire communication and who used or disclosed it. See Schneider, 308 U.S. at 162 (city should prevent littering by punishing litterers, not by prohibiting leafleting). Those who indirectly participated in the interception, either by aiding or abetting, would also fall within the sanctions provided by the statute. Therefore, the government's desired effect can be reached by enforcement of existing provisions against the responsible parties rather than by imposing damages on these defendants.

We are also concerned that the provisions will deter significantly more speech than is necessary to serve the government's asserted interest. It is likely that in many instances these provisions will deter the media from publishing even material that may lawfully be disclosed under the Wiretapping Acts.

Reporters often will not know the precise origins of information they receive from witnesses and other sources, nor whether the information stems from a lawful source. Moreover, defendants argue that they cannot be held liable for use and publication of information that had previously been disclosed. Assuming this is so, reporters may have difficulty discerning whether material they are considering publishing has previously been disclosed to the public. Such uncertainty could lead a cautious reporter not to disclose information of public concern for fear of violating the Wiretapping Acts.

Bartnicki and Kane recognize that the Supreme Court has frequently expressed concern about the "timidity and self-censorship" that may result from permitting the media to be punished for publishing certain truthful information. See, e.g., Florida Star, 491 U.S. at 535; Cox Broadcasting, 420 U.S. at 496. The public interest and newsworthiness of the conversation broadcast and disclosed by the defendants are patent. In the conversation, the president of a union engaged in spirited negotiations with the School Board suggested "blow[ing] off [the] front porches" of the School

Board members. Nothing in the context suggests that this was said in anything other than a serious vein. Certainly, even if no later acts were taken to follow through on the statement, and hence no crime committed, the fact that the president of the school teachers' union would countenance the suggestion is highly newsworthy and of public significance. Our concerns are only heightened by the Supreme Court's admonition in Smith that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." 443 U.S. at 102.

Our dissenting colleague does not disagree with any of the applicable legal principles. He candidly states that the difference between us is one of "ultimate application of [the agreed upon] analysis to the case at bar." Dissenting Op. at 36. Therefore, we add only a few brief comments pertaining to that application.

Evidently, one of the principal differences between our respective applications lies in the weight we give the factors to be balanced. The dissent suggests the Supreme Court's decisions in Schneider, Struthers, and Schaumburg are not pertinent to this case because the state interests in those cases (littered streets, annoying door-to-door proselytizers,6 and fraudulent charitable solicitors, respectively) were "not very important." The dissent contrasts those interests with the significant governmental interest at issue here -- that of maintaining the confidentiality of wire, electronic, and oral communications.

Presumably, the dissent's point is that we must weigh more heavily the privacy interests furthered by the Wiretapping Acts than the Court weighed the state interests in the three cited cases. Given the conceded importance of privacy and confidentiality at issue here, we nonetheless find it difficult to accord it more weight than the interests in preventing disclosure of the name of a rape victim, the identity of a judge in a putative disciplinary proceeding, or the identity of a youth charged as a juvenile offender at issue in Cox Broadcasting, Landmark Communications and

_____

6. The dissent fails to mention that one of the purposes for the ordinance referred to by the Court in Struthers was crime prevention. See 319 U.S. at 144-45.

Smith, respectively. Yet when faced with each of those circumstances, the Supreme Court determined that despite the strong privacy interest underlying the statutory and state constitutional provisions punishing disclosure of such information, the interests served by the First Amendment must take precedence.[7] It would be difficult to hold that privacy of telephone conversations are more "important" than the privacy interests the states unsuccessfully championed in those cases.

In addition, we do not share the dissent's confidence that imposition of civil liability on those who neither participated in nor encouraged the interception is an effective deterrent to such interception. The dissent finds such a nexus in the legislative landscape, where half of the states that prohibit wiretapping also authorize civil damage actions. With due respect, we find this a slim reed, not only because it appears from the dissent's statistics that the other half of the states with wiretapping statutes have not included a damage provision but because the incidence of state statutes, and hence "widespread legislative consensus," does not prove the deterrent effect of the prohibition. Indeed, there is not even general agreement as to the deterrent effect of a criminal statute on the perpetrator,[8] much less on those who were not in league with the perpetrator. In determining whether a regulation that restricts First Amendment rights "substantially serves [its asserted] purposes," see Grace, 461 U.S. at 182, the Court has never found that question satisfied by sheer numbers of state statutes.

_____

7. Although we acknowledge that those decisions arose from a stricter level of scrutiny than we employ here and somewhat different circumstances, the fact remains that the Court has generally tilted for the First Amendment in the tension between press freedom and privacy rights. This is bemoaned by the dissenting Justices in The Florida Star, who state candidly they "would strike the balance rather differently." 491 U.S. at 552 (White, J., dissenting). So, apparently, would the dissent in this case.

8. The opposing views of deterrence were noted in connection with capital punishment in Chief Justice Burger's dissenting opinion in Furman v. Georgia, 408 U.S. 238, 395–96 (1972).

30

The dissent engages in hyperbole when it suggests that our decision "invalidates a portion of the federal statute" and "by necessary implication spells the demise of a portion of more than twenty other state statutes." Dissenting Op. at 42. The statutes, which are designed to prohibit and punish wiretapping, remain unimpaired. All that is at issue is the application of those statutes to punish members of the media who neither encouraged nor participated directly or indirectly in the interception, an application rarely attempted.

Moreover, we do not agree that the recent decision in Boehner v. McDermott, 191 F.3d 463 (D.C. Cir. 1999), presented that court with the same issue presented here. Most particularly, in Boehner, where a divided court upheld the constitutionality of S 2511(1)(c), all three judges emphasized in their separate opinions that there was no effort to impose civil damages on the newspapers (The New York Times, et al.) which had printed the details of a conversation that been illegally intercepted. Thus, for example, in the lead opinion the court stated at the outset, "[n]or should we be concerned with whetherS 2511(1)(c) would be constitutional as applied to the newspapers who published the initial stories about the illegally-intercepted conference call." Id. at 467. Liability in that case was sought to be imposed on James McDermott, a congressman who caused a copy of the tape to be given to the newspapers. Although technically, defendant Yocum in our case stands in the same position as McDermott, i.e. as the source but not the interceptor, there is an indication in Boehner that McDermott was more than merely an innocent conduit. Indeed, McDermott, unlike Yocum, knew who intercepted the conversation because he "accepted" the tape from the interceptors and, the opinion suggests, not only sought to embarrass his political opponents with the tape but also promised the interceptors immunity for their illegal conduct. Id. at 475-76. In fact, the second judge, who concurred in the judgment and in only a portion of the opinion for the court, specifically limited his concurrence to the decision that S 2511(1)(c) "is not unconstitutional as applied in this case," id. at 478 (emphasis added), and pointed out that "McDermott knew the transaction was illegal at the time he entered into it," id. at 479. In contrast,

31

Yocum has not been shown to have "entered into" any transaction with the interceptors. In the posture of this case, all parties accept his allegation that the tape was left in his mailbox.

The Boehner court was acutely aware that no court has yet held that the government may punish the press through imposition of damages merely for publishing information of public significance because its original source acquired that information in violation of a federal or state statute. Cf. Landmark, 435 U.S. at 837 (finding it unnecessary to adopt categorical approach). As noted earlier in this opinion, the Supreme Court has been asked to permit a state to penalize the publication of truthful information in at least four instances. In three of the four cases, the statutes at issue protected the privacy interests of such vulnerable individuals as juveniles and the victims of sexual assault. See Florida Star, 491 U.S. at 526; Smith, 443 U.S. at 98; Cox Broadcasting, 420 U.S. at 472. In the remaining case, the statute at issue was meant to protect the state's interest in an independent and ethical judiciary. See Landmark, 435 U.S. at 830. Despite the strength of the state interests asserted, the Supreme Court in each case concluded that those interests were insufficient to justify the burdens imposed on First Amendment freedoms.

We likewise conclude that the government's significant interest in protecting privacy is not sufficient to justify the serious burdens the damages provisions of the Wiretapping Acts place on free speech. We are skeptical that the burden these provisions place on speech will serve to advance the government's goals. Even assuming the provisions might advance these interests, the practical impact on speech is likely to be "substantially broader than necessary." Ward v. Rock Against Racism, 491 U.S. 781, 800 (1989).

We therefore hold that the Wiretapping Acts fail the test of intermediate scrutiny and may not constitutionally be applied to penalize the use or disclosure of illegally intercepted information where there is no allegation that the defendants participated in or encouraged that interception. It follows that we need not decide whether these provisions leave open ample alternative channels for communication of information.

32

III.

CONCLUSION

For the reasons set forth, we will reverse the order of the District Court denying summary judgment to the defendants, and will remand with directions to grant that motion.

33

POLLAK, District Judge, dissenting.

The Court of Appeals for the District of Columbia Circuit
has recently determined, in Boehner v. McDermott, 191 F.3d
463 (D.C. Cir. 1999), that the First Amendment does not
bar a civil damage action brought, pursuant to 18 U.S.C.
S 2511(1)(c) and 18 U.S.C. S 2520(a), and pursuant to the
Florida statutory provisions that are counterparts of the
federal statute, against one who, so the plaintiff alleged,
gave to the New York Times and other newspapers copies of
a tape recording of a telephone conversation which the
defendant had "knowledge and reason to know" had been
unlawfully intercepted.1 Today this court holds that the

_____

1. In Boehner v. McDermott, the plaintiff, John Boehner, is a Republican
Representative who, together with other members of the Republican
leadership of the House of Representatives (including then Speaker
Gingrich), was in 1996 party to a conference telephone call that was
unlawfully intercepted by persons equipped with a radio scanner.
According to Representative Boehner's complaint, the interceptors turned
over the tape to James A. McDermott, a Democratic Representative who
was at the time the ranking minority member of the House Ethics
Committee; Representative McDermott in turn gave copies of the tape to
the New York Times and other newspapers; and the New York Times
promptly published part of the taped conversation. Representative
Boehner sued Representative McDermott, but did not sue the New York
Times or any other newspaper. The district court dismissed
Representative Boehner's complaint on First Amendment grounds. The
circuit court reversed.

The circuit court perceived a potentially important distinction between
Representative McDermott's First Amendment claim and the First
Amendment claim that might have been made by the New York Times or
another newspaper, if a newspaper had been named as a defendant.
Identifying that potential distinction, the court was at pains to confine
its analysis to Representative McDermott's claim:

    McDermott's liability under S 2511(1)(c) rests on the truth of two
    allegations: that he "caused a copy of the tape" to be given to the
    newspapers; and that he "did so intentionally and with knowledge
    and reason to know that the recorded phone conversation had been
    illegally intercepted (as the cover letter on its face disclosed)."
    Complaint P 20. Although the circumstances of McDermott's
    transactions with the newspapers, including who said what to
    whom, may become evidence at trial, it is his conduct in delivering

34

First Amendment does bar a civil damage action brought, pursuant to the Federal statute and its Pennsylvania counterpart, against (1) one who handed over a copy of a taped telephone conversation to a radio reporter, and (2) the radio reporter and the two radio stations that subsequently broadcast the tape, plaintiffs having alleged that both the person who handed over the tape and the radio reporter had, in the statutory language, "reason to know" that the taped conversation had been intercepted in contravention of the federal and Pennsylvania statutes. In the case decided today the court addresses a broader range of issues then those presented in Boehner v. McDermott: in Boehner v. McDermott the only defendant was the person who allegedly delivered to the media a copy of a tape of an allegedly wrongfully intercepted telephone conversation; in

_____

the tape that gives rise to his potential liability under S 2511(1)(c).

McDermott's behavior in turning over the tapes doubtless conveyed a message, expressing something about him. All behavior does. But not all behavior comes within the First Amendment.

"[E]ven on the assumption that there was[some] communicative element in" McDermott's conduct, the Supreme Court has held that "when `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The O'Brien framework is the proper mode of First Amendment analysis in this case. McDermott's challenge is only to the statute as it applies to his delivery of the tape to newspapers. Whether a different analysis would govern if, for instance, McDermott violatedS 2511(1)(c) by reading a transcript of the tape in a news conference, is therefore a question not presented here. Nor should we be concerned with whether S 2511(1)(c) would be constitutional as applied to the newspapers who published the initial stories about the illegally-intercepted conference call. The focus must be on McDermott's activity and on his activity alone.

191 F.3d at 467.

The author of the court's opinion was Judge Randolph. Judge Ginsburg filed a concurring opinion, joining part (including the paragraphs just quoted) of Judge Randolph's opinion. Judge Santelle filed a dissenting opinion.

35

today's case there are three "media defendants" in addition
to the defendant who allegedly delivered to the media a
copy of a tape of an allegedly wrongfully intercepted
telephone conversation.2

I am in general agreement with the careful analytic path
traced by the court through the minefield of First
Amendment precedents. However, I find myself in
disagreement with the court's ultimate application of its
analysis to the case at bar.

Accordingly, I respectfully dissent.3
_____

2. The Boehner v. McDermott court was at pains to point out the limited
scope of its ruling. See note 1, supra . See also note 3, infra.

3. Although I have expressed general agreement with the court's analytic
approach. I should note one aspect of the analysis on which I differ with
the court. That aspect is cogently illustrated by the distinction the
Boehner v. McDermott court drew between the First Amendment posture
of Representative McDermott and the potential First Amendment posture
of a newspaper that published (as the New York Times in fact did) a
portion of the intercepted telephone conference call, had such a
newspaper been sued. As the Boehner v. McDermott  excerpt quoted in
footnote 1, supra, makes clear, the court was doubtful that
Representative McDermott's action in giving copies of the tape to
newspapers was itself "speech" in the full First Amendment sense. Judge
Randolph, speaking for the court, saw Representative McDermott's First
Amendment claim as cabined by the Supreme Court's holding in United
States v. O'Brien, 391 U.S. 367, 376 (1968), that "when `speech' and
`nonspeech' elements are combined in the same course of conduct, a
sufficiently important governmental interest in regulating the nonspeech
element can justify incidental limitations on First Amendment freedoms."

In the case at bar, in which the plaintiffs have sued both Yocum and
media defendants, the United States argues that the approach reflected
in O'Brien and cases that follow it is appropriate to the entire case. The
court rejects that view. I find the Boehner v. McDermott exposition of
Representative McDermott's limited First Amendment posture
persuasive, and thus in the case at bar I would apply the O'Brien
approach to defendant Yocum -- whose role, from a First Amendment
perspective, seems analogous to that of Representative McDermott --
while rejecting O'Brien as the proper approach to the First Amendment
claims of the media defendants. However, the distinction is not one that
I need pursue, because, accepting for the purposes of the case at bar the
court's comprehensive rejection of O'Brien, I nonetheless wind up

36

I.

I agree with the court's statement of the case. And I agree
with the court's determination that the challenged federal
and Pennsylvania wiretapping statutes -- here invoked by
plaintiffs seeking damages for defendants' alleged
disclosure and use of a taped telephone conversation of
plaintiffs that defendants allegedly had "reason to know"
was the product of a prohibited "interception of a wire . . .
communication," 18 U.S.C. S 2511(c); 18 Pa. Cons. Stat.
S 5703(2) -- are "content neutral." I further agree with the
court that the proper standard to be applied in testing the
constitutionality of the federal and Pennsylvania statutes as
here applied is "intermediate scrutiny." Finally, I agree with
the court that intermediate scrutiny "always encompasses
some balancing of the state interest and the means used to
effectuate that interest." Slip Op., p. 23. Concretely, such
scrutiny calls for judicial assessment of whether the
challenged regulation is "narrowly tailored to serve a
significant governmental interest." Clark v. Community for
Creative Non-Violence, 468 U.S. 288, 293 (1984). 4

Where I part company with the court is in its application
of intermediate scrutiny in this case.

A.

The court begins by acknowledging what I take to be
beyond dispute: namely, that the professed governmental
_____

disagreeing with the court on how the court's analytic approach plays
out as applied, with the result that I conclude that liability in damages
could constitutionally have been imposed both on Yocum and on the
media defendants if the plaintiffs had been permitted to take their case
to trial and had proved their allegations to the satisfaction of the fact-
finder.

4. The other criterion identified in Clark v. Community for Creative Non-
Violence -- namely, whether the challenged regulation "leave[s] open
ample alternative channels for communication of the information" 468
U.S. at 293 -- is not pertinent to the case at bar because the challenged
statutes are not, as the challenged regulations in Clark v. Community for
Creative Non-Violence were deemed to be, "time, place or manner
restrictions." Ibid. And see id. at 295.

interest -- the interest of the United States (which is presumably also Pennsylvania's interest) in "maintain[ing] the confidentiality of wire, electronic, and oral communications," Brief for the United States, p. 33 -- is "a significant state interest." Slip Op., supra, p. 26. Then -- evidently with a view to exploring whether the challenged prohibition on disclosure or use of a conversation by one who had "reason to know" that the conversation was intercepted unlawfully is "narrowly tailored to serve [that] significant governmental interest" -- the court undertakes to "focus on the United States' . . . contention . . . that the provisions promote privacy by eliminating the demand for intercepted materials on the part of third parties." Slip Op., p. 26. The court then proceeds as follows:

> The connection between prohibiting third parties from using or disclosing intercepted material and preventing the initial interception is indirect at best. The United States has offered nothing other than its ipse dixit in support of its suggestion that imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnicki-Kane conversation. Nor has the United States offered any basis for us to conclude that these provisions have deterred any other would-be interceptors. Given the indirectness of the manner in which the United States claims the provisions serve its interest, we are not prepared to accept the United States' unsupported allegation that the statute actually produces the hypothesized effect. See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841 (1978) ("The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined."). Faced with nothing "more than assertion and conjecture," it would be a long stretch indeed to conclude that the imposition of damages on defendants who were unconnected with the interception even "peripherally promoted" the effort to deter interception. See Village of Schaumburg, 444 U.S. at 636.

38

When the state seeks to effectuate legitimate state
interests,

it must do so by narrowly drawn regulations
designed to serve those interests without
unnecessarily interfering with First Amendment
freedoms. Hynes v. Mayor of Oradell, 425 U.S. at
620; First National Bank of Boston v. Bellotti , 435
U.S. 765, 786 (1978). "Broad prophylactic rules in
the area of free expression are suspect. Precision of
regulation must be the touchstone. . . ." NAACP v.
Button, 371 U.S. 415, 438 (1963) (citations omitted).

Village of Schaumburg, 444 U.S. at 637.

In Village of Schaumburg, the Court stated that the
Village's legitimate interest in preventing fraud could
be better served by requiring solicitors to inform the
public of the uses made of their contributions, than by
prohibiting solicitation. Id. Similarly, in Martin v.
Struthers, 319 U.S. 141, 147-48 (1943), the Court held
that in lieu of a complete prohibition of door-to-door
solicitation, with its draconian impact on First
Amendment values, the City could have used the less
restrictive means of punishing those who trespass"in
defiance of the previously expressed will of the
occupant." Indeed, the Wiretapping Acts already
provide for punishment of the offender, i.e., the
individual who intercepted the wire communication
and who used or disclosed it. See Schneider, 308 U.S.
at 162 (city should prevent littering by punishing
litterers, not by prohibiting leafleting). Those who
indirectly participated in the interception, either by
aiding or abetting, would also fall within the sanctions
provided by the statute. Therefore, the government's
desired effect can be reached by enforcement of
existing provisions against the responsible parties
rather than by imposing damages on these defendants.

Slip Op. p. 26-28.

With all respect, I find this portion of the court's opinion
unpersuasive:

First: I take issue with the proposition that "[t]he
connection between prohibiting third parties from using or

39

disclosing intercepted material and preventing the initial interception is indirect at best." "[P]reventing the initial interception" is only part of the statutory scheme. The statutory purposes, as the court has noted, are"(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S. Rep. No. 90- 1079 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153. Unauthorized interception of a communication is prohibited -- and made both a criminal offense and an event giving rise to civil liability -- both to protect parties to a communication from an initial trespass on their privacy and to protect them from subsequent disclosure (and/or other detrimental use). "Unless disclosure is prohibited, there will be an incentive for illegal interceptions; and unless disclosure is prohibited, the damage caused by an illegal interception will be compounded. It is not enough to prohibit disclosure only by those who conduct the unlawful eavesdropping. One would not expect them to reveal publicly the contents of the communication; if they did so they would risk incriminating themselves. It was therefore `essential' for Congress to impose upon third parties, that is, upon those not responsible for the interception, a duty of non-disclosure." Boehner v. McDermott, 191 F.3d at 470.

Second: Given the close nexus between the legislative prohibition on unauthorized interception and the legislative imposition upon "third parties, that is, upon those not responsible for the interception, [of] a duty of non- disclosure," I am puzzled by the court's view that the argument presented by the United States in support of the statutory regime of civil liability lacks persuasiveness because it is not supported by a demonstration that "imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnicki- Kane conversation," or "that these [statutory] provisions have deterred any other would-be interceptors." Nor do I think the court's view is buttressed by the court's invocation of Landmark Communication, Inc. v. Virginia, 435 U.S. 829 (1978). It is true that in Landmark, in which the Supreme Court struck down, as applied to a newspaper, a

40

statute making it a misdemeanor to "divulge information" about confidential proceedings conducted by Virginia's Judicial Inquiry and Review Commission, the Court observed that "[t]he Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme [which contemplated a process of confidential inquiry into alleged judicial misconduct] would be seriously undermined." But the special -- and limited-- pertinence of the Court's observation becomes clear when it is read in context. The full paragraph follows:

> It can be assumed for purposes of decision that confidentiality of Commission proceedings serves legitimate state interests. The question, however, is whether these interests are sufficient to justify the encroachment on First Amendment guarantees which the imposition of criminal sanctions entails with respect to nonparticipants such as Landmark. The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined. While not dispositive, we note that more than 40 States having similar commissions have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants.

435 U.S. at 841. In striking contrast is the legislative landscape that forms the setting of the case at bar. Complementing the federal statute are more than forty state wiretapping statutes. Of these state statutes, approximately half have provisions which, like the federal statute, (1) prohibit disclosure or use of an intercepted conversation by one who knows or has "reason to know" that the interception was unlawful, and (2) authorize civil damage actions against one who discloses or uses such unlawful interception. As this case illustrates, Pennsylvania is one of those states. So are Delaware and New Jersey -- Pennsylvania's Third Circuit siblings. See 11 Del. Code Ann., S 1336 (1996); N.J. Stat. Ann. #8E8E # 2A-156 A-3, 2A-156-A24 (West 1985 & Supp. 1999). Listed in footnote 5 are the other state statutes that closely parallel the provisions of

41

the federal and Pennsylvania legislation challenged by defendants in the case at bar.5

In short, there appears to be a widespread legislative consensus that the imposition of civil liability on persons engaged in conduct of the kind attributed to these defendants is an important ingredient of a regime designed to protect the privacy of private conversations. Moreover, the decision announced today not only invalidates a portion of the federal statute and the counterpart portion of the Pennsylvania statute, it by necessary implication spells the demise of a portion of more than twenty other state statutes (and also of a statute of the District of Columbia); in the two centuries of American constitutional law I cannot recall any prior decision, whether of a federal court or of a state court, which, in the exercise of the awesome power of judicial review, has cut so wide a swath.

Third: What has been said points up the non-pertinence to the case at bar of Schneider v. State, 308 U.S. 147 (1939), Martin v. Struthers, 319 U.S. 141 (1943), and Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980), cases cited by the court as illustrative of the proposition that regulations designed to promote significant governmental interests should not sweep so broadly as to impose unnecessary constraints on First Amendment rights of free expression and communication. The constitutional shortcomings in Schneider (combating the littering of streets by curbing leafleting), Struthers (banning door-to-door distribution of circulars, including religious literature, in order to protect homeowners from

_____

5. Fla. Stat. Ann. SS 934.03, 812.15; Haw. Rev. Stat. SS 803-42(a)(3), 803-48; Idaho Code SS 18-6702, 18-6709; 720 Ill. Comp. Stat. Ann. 5/14-2, 5/14-6; Iowa Code SS 808B.2(1)(c), 808B.8; La. Rev. Stat. Ann. SS 15:1303A(3), 15:1312; Md. Code Ann. S 10-402(a)(2), 10-410; Mich. Comp. Laws Ann. SS 750.539e, 750.539h; Minn. Stat. Ann. SS 626A.02(c), 626A.13; Neb. Rev. Stat. SS 86-702, 86-702.02; N.H. Rev. Stat. Ann. SS 570-A:2, 570-A:11; N.C. Gen. Stat. SS 15A-287, 15A-296; Ohio Rev. Code Ann. SS 2933.52, 2933.65; Tenn. Code Ann. SS 39-13-601, 39-13-603; Utah Code Ann. SS 77-23a-4, 77-23a-11; Va. Code Ann. SS 19.2-62, 19.2-69; W. Va. Code SS 62-1D-3, 62-1D-12; Wis. Stat. S 968.31; Wyo. Stat. Ann. SS 7-3-602, 7-3-609; See also D.C. Code Ann. SS 23-542, 23-554.

annoyance), and Village of Schaumburg (combating allegedly fraudulent charitable solicitation by banning all solicitation by groups not disbursing 75% of receipts) involved situations in which small towns imposed on traditional First Amendment activities pervasive constraints sought to be justified as ways of dealing with distinct (and not very important) problems that could have been more effectively addressed by governmental action directed at the actual problems – e.g., prosecuting litterers (Schneider); prosecuting as trespassers solicitors who do not depart when requested by homeowners to do so (Struthers ); requiring organizations soliciting contributions to disclose how receipts are used (Village of Schaumburg). In the case at bar, unauthorized disclosure (or other use) of private conversations is a central aspect of the very evil the challenged statutory provisions are designed to combat.

B.

The court also notes that "[r]eporters often will not know the precise origins of information they receive from witnesses and other sources, nor whether the information stems from a lawful source," or, indeed, "whether material they are considering publishing has previously been disclosed to the public." Slip Op., p. 28, As a result, the court opines, "[i]t is likely that in many instances these [challenged statutory] provisions will deter the media from publishing even material that may lawfully be disclosed under the Wiretapping Acts." Ibid.

I think the court overstates the potential problems of the media. One would suppose that a responsible journalist –– whether press or broadcast –– would be unlikely to propose publication of a transcript of an apparently newsworthy conversation without some effort to insure that the conversation in fact took place and to authenticate the identities of the parties to the conversation. As part of such an inquiry, the question whether the parties to the conversation had authorized its recording and release, or whether others had lawfully intercepted the conversation, would seem naturally to arise. Moreover, current technology would make it relatively easy to determine whether the

43

conversation had been the subject of a prior press or broadcast report.6

In my judgment, a more substantial First Amendment difficulty is posed by the fact that the person or entity charged with knowing or having "reason to know" that a published conversation was unlawfully intercepted is called on to contest before a judicial fact-finder (whether jury or judge) a plaintiff 's allegation of knowledge or"reason to know." But the difficulties attendant on fact-finder oversight of journalistic practice (or, indeed, of public disclosure by non-journalists) can, I believe, be met by adoption of the procedural proposals advanced in the brief for the United States:

> In criminal prosecutions under Title III, scienter must be proved beyond a reasonable doubt. In civil cases scienter ordinarily would be subject to a conventional preponderance-of-the-evidence standard. When a claim is brought for disclosure of information about matters of public significance by persons who were not involved in the illegal interception, however, a preponderance-of-the-evidence standard may operate to deter the publication of information that was not the product of illegal surveillance. To avoid that result, it might prove appropriate for district courts to impose a higher standard of proof of scienter in such cases, such as

_____

6. On occasion, inquiry of the kind suggested might indeed take a few days. But news reporting -- especially with respect to events (such as a conversation) that are concluded, rather than still evolving -- need not be an instant process. In the case at bar, it appears that defendant Vopper did not broadcast the conversation until some months after defendant Yocum gave him a copy of the tape. Deposition of Frederick W. Vopper, App. 60a-61a. On the other hand, the New York Times published a portion of the intercepted conversation that gave rise to Boehner v. McDermott the day after it received the tape. The New York Times story also reported that the tape had been"made . . . available to the New York Times" by "a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further" and who told the Times that the tape had been given to him [on January 8, 1997] by a couple who said the tape "had been recorded [on December 21, 1996] off a radio scanner, suggesting that one participant was using a cellular telephone." N.Y. Times, January 10, 1997, p.1, col.3.

44

> proof by "clear and convincing" evidence, and for
> appellate courts to conduct independent review of the
> findings of the trier of fact. Cf. Gertz v. Robert Welch,
> Inc., 418 U.S. 323, 342 (1974) (requiring clear and
> convincing evidence of "actual malice" in defamation
> cases); Bose Corp. v. Consumers Union of United States,
> Inc., 466 U.S. 485, 498-511 (1984) (de novo  appellate
> review of findings regarding actual malice). See
> generally Waters v. Churchill, 511 U.S. 661, 669-71
> (1994) (plurality opinion) (discussing circumstances in
> which First Amendment requires modifications of
> burdens of proof and other procedural rules).

Brief for the United States, pp. 40-41 n. 8.7

II.

As the court's opinion makes plain, the First Amendment values of free speech and press are among the values most cherished in the American social order. Maintenance of these values (and the other values of the Bill of Rights) against overreaching by the legislature or the executive is among the judiciary's major and most demanding responsibilities. In the case at bar, however, the First Amendment values on which defendants take their stand are countered by privacy values sought to be advanced by Congress and the Pennsylvania General Assembly that are of comparable – indeed kindred – dimension. Three decades ago the late Chief Judge Fuld of the New York Court of Appeals put the matter well in Estate of Hemingway v. Random House, 23 N.Y. 2d 341, 348, 244 N.E.2d 250, 255 (1968) (in words that the Supreme Court has quoted with

_____

7. The court's decision has the anomalous consequence of cloaking Yocum, who is not a "media defendant", with the First Amendment protections the court deems appropriate for radio reporter Vopper and the two radio stations. I have undertaken to explain in footnote 3, supra, that in my judgment Yocum has a far more tenuous First Amendment claim (if any) than the media defendants. I do not think that, merely by virtue of the fortuity that the plaintiffs have elected to sue Yocum and the media defendants (which the plaintiff in Boehner v. McDermott did not do), Yocum becomes a third-party beneficiary of whatever First Amendment protections may accrue to the media defendants.

approval, Harper & Row Publishers v. National Enterprises, 471 U.S. 539, 560 (1985)):

> The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit